*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WORD NETWORK OPERATING COMPANY, INC.,

        Plaintiff/Counterdefendant-Appellee,

v

QUENTON ROSS and Q11 PHOTOGRAPHY, LLC,

        Defendants/Counterplaintiffs/Third-Party Plaintiffs-Appellants,

and

MALEA HOWARD,

        Defendant/Counterplaintiff/Third-Party Plaintiff,

and

KEVIN ADELL and RALPH LAMETI,

        Third-Party Defendants.

UNPUBLISHED
March 2, 2023

No. 360140
Oakland Circuit Court
LC No. 2020-181159-CB

Before: GADOLA, P.J., and BORRELLO and HOOD, JJ.

PER CURIAM.

Defendants Quenton Ross and Q11 Photography, LLC ("Q11 Photography") appeal as of right a judgment for plaintiff The Word Network ("TWN"), entered after a jury trial, awarding plaintiff $28,000 on its claims for common-law and statutory conversion. Defendants also challenge the trial court's postjudgment order awarding plaintiff case evaluation sanctions. For the reasons set forth in this opinion, we affirm.

-1-

## I. BACKGROUND

TWN is a cable television network carrying religious programming. It appears that there is an affiliated radio station as well. Ross worked for TWN for over 10 years and held the position of senior editor and director of production. His responsibilities included overseeing production of shows that aired on the network, creating content for TWN, and working on various projects as directed by TWN's owner and CEO, Kevin Adell.

In addition to his position with plaintiff, Ross operated his own photography company, Q11 Photography. Page Alston testified that she had simultaneously worked for both TWN, as a production assistant where she reported to Ross, and Ross at Q11. She sometimes did Q11 work during her TWN work hours.

There was evidence that on March 23, 2020, TWN laid off all non-essential personnel, including production and studio staff, due to the COVID-19 pandemic. However, although Ross admitted that he was told to go home and was not among those employees that would continue to report to work, Ross nonetheless maintained that he was never told that he was laid off or that he would not be returning to work at TWN. Ross testified that Adell merely told him that the station would be put on "auto-pilot" and that only essential employees would continue to report to work during that time.

Pete Glass, the director of engineering for TWN, was one of the employees who was deemed essential and continued to report to work after March 23. He testified that TWN continued to produce one live half-hour show each day during this time, using Skype so as to avoid the need to bring the host to the studio. Producing and airing the show involved using the "switcher," which apparently was some type of production or control board, that was located in the production truck outside the studio.

Glass went to the studio on April 3, 2020, and discovered that monitors in the master control room were not operating correctly. He went out to the production truck and discovered that the switcher and a computer in the production truck were "inoperable." Glass also testified that the videos and graphics stored on the internal hard drive of this computer had been deleted. Glass was unable to get the equipment to operate and it was needed to air the live show that day using Skype. However, he was eventually able to use Skype by bypassing the production truck.

Glass was asked to investigate whether anyone had entered the production truck during the previous evening. Closed-circuit security video recordings showed that Ross entered the production truck on the night of April 2, 2020. The surveillance video then showed Ross entering the building where his office was located and entering his office, where he remained for almost an hour. He did not have a backpack when he entered the building, but he was carrying a backpack when he left. TWN's security records showed that Ross used an unassigned, backup keycard to enter the premises rather than using the security keycard assigned to him. Ross was at plaintiff's premises from approximately 9:30 p.m. to 10:30 p.m.

TWN also discovered that an iMac computer in Ross's office was no longer operable. There was no sign-on screen to allow someone to enter the system to access content stored on the computer. The computer was sent out for forensic analysis, but it was apparently not possible to

recover the data from the computer without Ross's administrator username and password. Glass indicated that he would have expected this computer to contain shows, graphics, and artwork for TWN. Adell testified that he would have expected there to be "years and years of stuff that we could call back" stored on Ross's computer, such as old shows and interviews. Adell explained that it was common to reuse old content, and that the material on Ross's computer was not replaceable. However, Adell also seemed to indicate that there were other hard drives and servers where this content may have been stored, while simultaneously claiming that content was "probably" missing and that he did not know what was stored on backup servers because he maintained a "50,000 foot overview" of operations at TWN.

Testimony was introduced at trial that the switcher in the production truck was no longer operable and was no longer being used. There was also testimony that everything in the production truck had been working on April 2, 2020, when Glass checked at 5:00 p.m., before Glass left for the day and before Ross went into the production truck later that night.

At trial, Ross admitted that he entered the production truck and his office in the editing suite that night. He admitted going into the production truck to "delete" the "user preferences" that he had created on the switcher and that he did not have permission to do so. Ross also admitted that he deleted videos and files from his office computer on the night of April 2, 2020. He claimed he "was deleting files that we no longer use" and that he was acting for a legitimate business reason. Ross maintained that anything he deleted was obsolete and that content he created was still available to TWN on other computers or servers. He sent an e-mail at some point to staff with a photograph of items he claimed were in the backpack that he took from his office. Those items consisted of a coffee mug, a Bible, and two external hard drives that Ross claimed were his personal property. TWN requested that Ross produce those hard drives during discovery, but Ross claimed that they had been lost.

There was evidence at trial that TWN made an insurance claim for the switcher, that the damage was determined to be about $25,000, and that TWN consequently received a $19,000 payment from its insurer after the insurance company factored in TWN's deductible. There was additional evidence that TWN was seeking $600,000 in damages from Ross, which was the amount of Ross's salary over the past 5 years during which he created the content that TWN alleged was deleted.

The jury found defendant Ross liable for common law conversion and statutory conversion, and the jury found defendant Q11 Photography liable for statutory conversion. The jury awarded plaintiff damages of $28,000 against defendants Ross and Q11 Photography. This appeal followed.

## I. DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

Defendants first argue that the trial court erred by denying their motion for a directed verdict at trial and by also denying their subsequent motion for judgment notwithstanding the verdict ("JNOV"). Defendants contend that the trial evidence was insufficient to identify the converted property and that the damages awarded were based on speculation such that defendants were entitled to judgment in their favor as a matter of law.

This Court reviews "de novo a trial court's decision on a motion for a directed verdict." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 345; 871 NW2d 136 (2015). "A party is entitled to a directed verdict if the evidence, when viewed in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law." *Id*. If the evidence could cause reasonable jurors to disagree, the trial court is not permitted to substitute its judgment for that of the jury. *Lamson v Martin (After Remand)*, 216 Mich App 452, 455; 549 NW2d 878 (1996).

This Court also reviews de novo a trial court's decision to grant or deny a motion for JNOV. *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 77; 684 NW2d 296 (2004). This Court must "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party" and "[o]nly when the evidence viewed in this light fails to establish a claim as a matter of law is the moving party entitled to judgment notwithstanding the verdict (JNOV)." *Id*. (quotation marks and citations omitted). "[I]f reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 605-606; 886 NW2d 135 (2016) (quotation marks and citation omitted). "[U]nless a plaintiff's case is wholly lacking evidence on an element of a claim, the jury is allowed to make reasonable inferences from the evidence and make credibility determinations." *Id*. at 606 n 29. It is the jury's task to make determinations about witness credibility and the weight to be given to witness testimony. *Id*.

This action involves claims of both common-law conversion and statutory conversion. "Under the common law, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines*, 497 Mich at 346 (quotation marks and citation omitted). Our Supreme Court has held that common-law conversion is a tort that "broadly encompasse[s] any conduct inconsistent with the owner's property rights." *Id*. at 353. Statutory conversion is defined in MCL 600.2919a and is a separate cause of action that is similar, but not identical, to common-law conversion. *Aroma Wines*, 497 Mich at 353-354, 361. An action under MCL 600.2919a may be pursued "in addition to any other right or remedy the person may have at law or otherwise." MCL 600.2919a(2).

Here, defendants do not make any distinction in their appellate arguments between the common-law and statutory conversion claims. Defendants appear to argue that they were entitled to judgment as a matter of law in their favor on both types of conversion claims because there was insufficient evidence to identify any property that was actually converted and the claimed damages were based on speculation.

These two particular issues—property alleged to have been converted and alleged damages—are clearly common to both common-law and statutory conversion claims. See *Aroma Wines*, 497 Mich at 346 (defining common-law conversion as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein") (quotation marks and citation omitted); *id*. at 347-348 ("The word 'converting,' used in MCL 600.2919a(1)(a), is one word that has acquired a peculiar and appropriate meaning in the law because it is derived from the common-law [conversion] tort . . . and is used in that context here."); *Willis v Ed Hudson Towing, Inc*, 109 Mich App 344, 349; 311 NW2d 776 (1981) ("The measure of damages for the conversion of personal property is the value of the property at the time of the conversion, in the absence of any testimony establishing a peculiar value in the goods to the

owner."); MCL 600.2919a(1) (providing for recovery of "3 times the amount of actual damages sustained" as a result of the conduct described in the statute). Thus, as the argument has been presented by defendants on appeal, we need not address the differences between common-law and statutory conversion to resolve the issue presented on appeal.

Here, there was evidence that Ross entered TWN's premises late at night and that the switcher and computer in the production truck that had previously been functional were no longer operable the next morning after Ross—admittedly—deleted material that he personally deemed obsolete. The computer in Ross's office was also inoperable. There was evidence that the insurance company determined the value of the switcher, and there was evidence of the amount Ross had been paid to create content for TWN. The jury awarded damages that were *significantly* less than the damages claimed by TWN.

To the extent defendants' appellate arguments focus on witness credibility and defendants' views on the relative strength of evidence, these are questions that are reserved for the jury and do not provide a proper basis for this Court to conclude that there was error in denying defendants' motion for a directed verdict or motion for JNOV. *Aroma Wines*, 497 Mich at 345; *Lamson*, 216 Mich App at 455; *Craig*, 471 Mich at 77; *Hecht*, 499 Mich at 605-606, 606 n 29.

Contrary to defendants' assertions in their briefing and at oral argument, there was evidence of the value of converted property introduced into the record. *Willis*, 109 Mich App at 349. Defendants merely disagree with the jury's view of this evidence and have attempted to retry their case in this Court, which is not a proper manner of obtaining appellate relief.[1] *Lamson*, 216 Mich App at 455; *Hecht*, 499 Mich at 605-606, 606 n 29.

To the extent defendants argue in the alternative, without citing any relevant legal authority in support, that the damages award should be reduced to $5,000 because that was the amount of TWN's insurance deductible, this argument is without merit. This Court has stated with respect to a statutory conversion claim:

> The definition of "actual damages," however, does not contemplate the victim's receipt of insurance proceeds in determining actual damages. Actual damages must exist in the first instance before the question of insurance proceeds properly arises. Once inflicted and created, actual damages do not change simply because an insurer has a contractual obligation to compensate the victim in whole or in part. The statute in question is not designed or intended to minimize a defendant's liability for his criminal conduct if his victim had the wherewithal to purchase insurance coverage to protect itself from the criminal conduct of third parties. It is the embezzler's misconduct, not the interplay between the embezzler and the victim's

---

[1] We note that defendants' arguments about contradictions in various testimony merely go to the strength and weight of evidence; such arguments do not establish, as defendants contend, that there was *no* evidence on a given matter.

insurer, that creates actual damages. [*Alken-Ziegler, Inc v Hague*, 283 Mich App 99, 103-104; 767 NW2d 668 (2009).]

Although this Court in *Alken-Ziegler* discussed a defendant who had embezzled money, embezzlement is merely one form of the wrongful conduct, in addition to conversion, that is proscribed in MCL 600.2919a.[2] We conclude that the above reasoning quoted from *Alken-Ziegler* applies with equal force to damages for common-law conversion, which are generally measured by "value of the property at the time of the conversion," *Willis*, 109 Mich App at 349. For these reasons, we affirm the trial court's rulings denying defendants' motions for directed verdict and JNOV.

## II. Q11 PHOTOGRAPHY'S LIABILITY FOR CONVERSION

Next, defendants argue that Q11 Photography cannot be liable for statutory conversion, contrary to the jury's verdict, because Q11 Photography was no longer a defendant in the action by the time the trial started. Defendants contend that because TWN was permitted to orally amend its complaint before trial to dismiss its tortious-interference-with-a-business-relationship claims against defendants, and because this was the only claim against Q11 Photography in the complaint, Q11 Photography should have been dismissed from the case and the jury should not have been permitted to find Q11 Photography liable for statutory conversion. Further, defendants maintain that TWN never requested to amend its complaint to add any claims for conversion against Q11 Photography.

On the first day of trial, before jury selection began, TWN requested to amend its complaint to dismiss its tortious interference claims. Defendants' counsel objected to this request because defendants had prepared to defend all of the claims, and defendants' counsel further argued, "I think that they should be forced to proceed forward on those claims, because it's gonna basically

---

[2] MCL 600.2919a provides:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

expose the -- this entire thing is meritless in my opinion." The trial court overruled defendants' objections and granted TWN's request to amend.

When the jury panel was brought into the courtroom, the trial court informed the jury that Ross and Q11 Photography were the defendants. Once the jury was selected, the trial court's preliminary instructions informed the jury that there was a claim for statutory conversion against both Ross and Q11 Photography and generally described the elements of the claims. After the preliminary instructions were concluded, the jury was excused and defendants' counsel raised "two procedural questions" for the court. As relevant to the issue on appeal, defendants' counsel stated, "the plaintiffs have -- (undecipherable) -- a motion and it's granted, dismiss their tortious inference by -- (undecipherable) – only -- the only count for Q11 is the tortious interference. So I'm -- I'm assuming that they're no longer gonna be a defendant . . . ." The parties then proceeded to present argument regarding the other procedural question raised by defendants. This discussion is not relevant to our present analysis. Defendants never returned to the first issue raised regarding Q11's status as a defendant, and it appears defendants never obtained a ruling from the trial court on this issue.

The trial proceeded. Before the trial court read the final jury instructions to the jury, defense counsel specifically responded, "Yes, Judge," when the trial court asked if the submitted final jury instructions were acceptable. During final jury instructions, the trial court instructed the jury in relevant part:

> In addition to the common law conversion claim, plaintiff also serves a claim for statutory conversion. If you find from the evidence that defendant Ross stole or converted plaintiff's property to his own use or that the defendant Q11 received, possessed, concealed, or aided in the concealment of stolen or converted property, knowing that the property was stolen or converted, then your verdict will be for the plaintiff on its claim of statutory conversion.

Additionally, the trial court read the contents of the jury verdict form into the record as follows:

> No questions having been asked, I have approved a verdict form for your use in the jury room, and the jury form reads as follows.

> Question number one, is defendant Quenton Ross liable for common law conversion of plaintiff's property? You may answer yes or no.

> Question number two, is defendant Quenton Ross liable for statutory conversion? You may answer yes or no.

> With respect to question number three, is defendant Q11 Photography, LLC liable for statutory conversion? You can answer yes or no.

> And question four, is -- if your answer to any or all of the questions one, two, or three are "yes," what is the amount of damages, if any, suffered by the plaintiff?

While the jury was deliberating, a question was posed for the trial court. The following discussion occurred between the trial court and the attorneys on the record regarding the question:

> *The Court*: All right. Counselors, I have a -- a note from the jury. I believe I know what the answer should be, but just to make sure that everybody's on the same page. The question is do we need to answer yes or no to each question?
>
> [*TWN's Counsel*]: I would think so.
>
> [*Defendants' Counsel*]: Yes, right?
>
> [*TWN's Counsel*]: Sorry, I was confused there.
>
> [*Defendants' Counsel*]: Yes.

After discussing the matter with the attorneys, the trial court indicated that it would instruct the jury, "You are to answer yes or no to questions one through three, and whatever amount of damages, if any, you determine for question number four." TWN's counsel and defendants' counsel specifically approved this instruction. As previously stated, the jury answered "yes" to the first three questions and awarded $28,000 in damages.

Under these circumstances, defendants expressly waived this argument for appeal. "A waiver is an intentional relinquishment or abandonment of a known right." *Nexteer Auto Corp v Mando America Corp*, 314 Mich App 391, 395; 886 NW2d 906 (2016). "An affirmative expression of assent constitutes a waiver[,]" *id.*, and "the use of specific key words is not required to waive a right[,]" *id.* at 396. See also *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 545; 854 NW2d 152 (2014) ("A party is deemed to have waived a challenge to the jury instructions when the party has expressed satisfaction with, or denied having any objection to, the instructions as given.").

Here, defendants expressly approved the jury instructions and verdict form instructing the jury to determine whether Q11 Photography was liable for statutory conversion and, by extension, expressly approved including Q11 Photography as a defendant against whom a statutory conversion claim was alleged. *Nexteer Auto Corp*, 314 Mich App at 395, 396; *Landin*, 305 Mich App at 545. Thus, to the extent there could have been error,[3] it was extinguished by defendants' waiver and appellate review is precluded. *Landin*, 305 Mich App at 545.

Moreover, MCR 2.118(C)(1) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised by the pleadings.

---

[3] We express no opinion whether there could have been error on the ground asserted by defendants on appeal.

-8-

In that case, amendment of the pleadings to conform to the evidence and to raise those issues may be made on motion of a party at any time, even after judgment.

Here, the same facts that demonstrate defendants' waiver also demonstrate defendants' implied consent to treating the complaint as if it had alleged a statutory conversion claim against Q11 Photography. Defendants on appeal have not established error requiring reversal on this ground.

### III. CASE-EVALUATION SANCTIONS

Finally, defendants also argue that the trial court erred by awarding plaintiff case evaluation sanctions under MCR 2.403(O) after that rule was amended to remove the sanctions provisions.

The judgment in this case was entered on December 22, 2021, awarding TWN $28,000 against defendants. On January 18, 2022, TWN moved for case evaluation sanctions under MCR 2.403(O). TWN argued that it was entitled to case evaluation sanctions because it had accepted the $25,000 award recommended by the case evaluation panel and defendants had rejected this recommendation. Defendants opposed the motion for case evaluation sanctions. As relevant to defendants' appellate argument, defendants argued that the Michigan Supreme Court had recently amended MCR 2.403 to delete the provision that provided for case evaluation sanctions. Defendants expressly stated on the record that they did not contest the amount requested by TWN. The trial court granted TWN's motion for case evaluation sanctions, reasoning that the prior rule was in effect when the parties had case evaluation and the amendment did not take effect until January 1, 2022.

MCR 2.403(O)(1) formerly provided in relevant part that if "a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation."[4] However, in a December 2, 2021 order, our Supreme Court adopted amendments to MCR 2.403, which were to become effective on January 1, 2022. 508 Mich ___ (2021). In relevant part, the amendment completely eliminated Subrule (O), thereby eliminating case evaluation sanctions. *Id*. at ___.

Hence, the issue on appeal becomes whether the former rule continued to apply to this case, in which essentially the entire action had concluded and a judgment in TWN's favor had been entered before the amendment took effect but TWN had not filed its postjudgment motion for case evaluation sanctions under MCR 2.403(O) before the amendment took effect.

"A trial court's decision whether to grant case-evaluation sanctions under MCR 2.403(O) presents a question of law, which this Court reviews de novo." *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008) (opinion by TAYLOR, C.J.). Additionally, the "proper interpretation and application of a court rule is a question of law, which this Court reviews de novo." *Haliw v City of Sterling Hts*, 471 Mich 700, 704; 691 NW2d 753 (2005).

---

[4] Former MCR 2.403(O) contained further details about the operation of case evaluation sanctions, but we need not discuss these details for purposes of resolving the issue presented in this appeal.

This Court has stated that, with respect to newly adopted or amended court rules, the general rule is to apply newly adopted or amended court rules "to pending actions unless there is reason to continue applying the old rules." *Reitmeyer v Schultz Equip & Parts Co, Inc*, 237 Mich App 332, 337; 602 NW2d 596 (1999) (quotation marks and citation omitted). There is not a bright-line rule to determine whether the new or old rule applies in a given case; instead, "a court must look more closely to the particular circumstances of the case at issue and at the purpose of the amendment." *Id*. at 342.

In *Reitmeyer*, this Court held that determining whether a newly amended or adopted court rule applies in a given case is governed by MCR 1.102 "because MCR 1.102 provides its own specific rules for the application of new and amended court rules that should take precedence over the generalized rules of retrospectivity and prospectivity." *Reitmeyer*, 237 Mich App at 337. In relevant part, MCR 1.102 provides that a "court may permit a pending action to proceed under the former rules if it finds that the application of these [new] rules to that action would not be feasible or would work injustice." "[A] trial court's decision whether application of new court rules would 'work injustice' under MCR 1.102 entails an exercise of discretion." *Reitmeyer*, 237 Mich App at 336. A trial court abuses its discretion if its decision "is outside the range of reasonable and principled outcomes." *Hecht*, 499 Mich at 604.

"[A] new court rule would 'work injustice' 'where a party acts, or fails to act, in reliance on the prior rules and the party's action or inaction has consequences under the new rules that were not present under the old rules.' " *Reitmeyer*, 237 Mich App at 337 (citation omitted). "[A]n injustice is not present merely because a different result would be reached under the new rules." *Id*. (quotation marks and citation omitted). We have explained that MCR 1.102 "focuses on 'injustice' in the context of whether changes in rules in the midstream of the legal process have operated unfairly on one of the parties" and "is premised on the fundamental 'rule of law' notion that parties should be able to rely on the rules as they exist at the time that they undertake conduct." *Id*. at 339-340. Thus, although a new or amended rule may usually not be unfair or unworkable such that it should apply to pending cases "most of the time," a "change in the rules when a party has already made decisions relying on the former rules will more clearly and logically result in 'injustice' than when both parties have relied on the same rules throughout a case . . . ." *Id*. at 340.

Finally, this Court has explained that "while the results may be different between the old and new rule, as may ordinarily be expected, this is not the dispositive factor in the analysis. Rather, . . . several factors must be considered when determining the 'injustice' in a particular case and whether a party 'relied' on a court rule to the extent that it would be 'unjust' to alter the rule in midstream." *Id*. at 345. These factors include the substance of the rule, the timing of relevant actions, and the reliance or lack of reliance on the old rule at the time pertinent decisions were made in the case. *Id*.

Here, the sanction provisions of MCR 2.403(O) were in effect at all times throughout the case evaluation process, while the parties were deciding whether to accept or reject the case evaluation award, during trial, and up until entry of a final judgment. The potential liability for case evaluation sanctions under MCR 2.403 was one of the factors for the parties to consider in their negotiations and decisions whether to proceed to trial and in considering the relative strengths and weaknesses of their cases relative to the case evaluation award. All events establishing plaintiff's entitlement to case evaluation sanctions occurred before the effective date of the

amended court rule. Applying the amended version of the rule after all of the pertinent decisions had been made under the old rule would essentially result in a windfall to defendants under these circumstances. Because the parties acted in reliance under the old rule in proceeding to trial, and the decision to proceed to trial carried consequences and rights that were eliminated by the new rule, there was a valid reason to apply the pre-amendment version of MCR 2.403(O) to avoid an injustice. *Reitmeyer*, 237 Mich App at 337. Accordingly, defendants have not shown that the trial court abused its discretion by determining that the new amendment should not apply under the circumstances of this case. *Hecht*, 499 Mich at 604.

Affirmed. Plaintiffs having prevailed are entitled to costs. MCR 7.219(A).

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Noah P. Hood